Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMIT PATEL, derivatively on behalf of APPLOVIN CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> ADAM FOROUGHI, MATTHEW STUMPF, CRAIG BILLINGS, HERALD CHEN, MARGARET GEORGIADIS, ALYSSA HARVEY DAWSON, BARBARA MESSING, TODD MORGENFELD, EDWARD OBERWAGER, and EDUARDO VIVAS, <br><br> Defendants, <br><br> and <br><br> APPLOVIN CORPORATION, <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Plaintiff Amit Patel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant AppLovin Corporation ("AppLovin" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Adam Foroughi ("Foroughi"), Matthew Stumpf ("Stumpf"), Craig Billings ("Billings"), Herald Chen ("Chen"), Margaret Georgiadis ("Georgiadis"), Alyssa Harvey Dawson ("Harvey Dawson"), Barbara Messing ("Messing"), Todd Morgenfeld ("Morgenfeld"), Edward Oberwager ("Oberwager"), and Eduardo Vivas ("Vivas") (collectively, the "Individual Defendants," and together with AppLovin, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors,s and/or officers of AppLovin, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Foroughi and Stumpf for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AppLovin, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 10, 2023 through February 25, 2025, inclusive (the "Relevant Period").

2.    AppLovin provides a software-based platform for advertisers that strengthens the marketing and monetization of advertising content within the United States and around the world.

3.    The Company reports operating results through two segments. The first is its Advertising segment, which offers end-to-end artificial intelligence ("AI") supporting advertising solutions, which customers can use to reach, monetize, and grow their audiences. The second is the Apps segment, in which the Company operates its vast array of owned mobile apps.

4.    During the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements that made it appear to investors that the launch of the Company's AXON 2.0 digital advertising platform and the use of "cutting-edge AI technologies" to help the Company better match advertisements to mobile games would better promote the Company's financial growth and stability. The Individual Defendants also strengthened these claims by discussing the Company's recent expansion into web-based marketing and e-commerce.

5.    For example, on May 10, 2023, the Company issued a press release announcing the Company's financial results for the first quarter (the "Q1 2023 Earnings Release") of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"). The Q1 2023 Earnings Release announced the growth initiatives the Company was taking, stating:

> In the first quarter of 2023 we continued to execute against our growth initiatives and exceeded the top end of our guidance. After substantially completing our cost and Apps portfolio optimization projects, our team is focused on three key growth initiatives within our Software Platform segment: 1) upgrading our core machine learning AXON technology; 2) expanding our ad solutions into Connected-TV; and 3) extending our marketing platform to carriers and OEMs.

6.    The truth did not emerge until February 26, 2025 when analysts published reports that revealed the Company was reverse engineering and manipulating data from

Meta Platforms. The reports also claimed that the Company participated in the Application Misconduct through utilizing manipulative practices, such as causing their ads to click on themselves or taking advantage of design gimmicks to trigger forced downloads, artificially boosting their own click-through and download rates and leading to inflated installation numbers and profits (collectively, the "Application Misconduct").

7.    On this news, the price of the Company's stock fell $46.06 per share, or approximately 12.2%, from a close of $377.06 per share on February 25, 2025, to close at $331 per share on February 26, 2025.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) neither the AXON 2.0 platform nor the Company's "cutting-edge AI technologies" were responsible for the Company's ability to better match advertisements to mobile games; (2) in fact, the Company was actually taking advantage of advertising data from Meta Platforms; (3) the Company was also participating in manipulative practices to force unwanted apps on customers through a "backdoor installation scheme; (4) this "backdoor installation scheme" artificially inflated the Company's installation numbers on its applications; and (5) as a result of the foregoing, the Company's profits were artificially inflated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.    Moreover, five of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $254.2 million.

10.    In light of the Individual Defendants' misconduct—which has subjected the Company, its co-Founder, Board Chairman, and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Foroughi's and Defendant Stumpf's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

15.   This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.   Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.   Plaintiff is a current shareholder of AppLovin. Plaintiff has continuously held AppLovin common stock at all relevant times.

### Nominal Defendant AppLovin

18.   AppLovin is a Delaware corporation with corporate headquarters located at 1100 Page Mill Road, Palo Alto, California 94304. AppLovin's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "APP."

### Defendant Foroughi

19.   Defendant Foroughi co-founded the Company in 2011 and has served as its CEO and a director since then. He has also served as the Chairman of the Company's Board since March 2021. According to the Schedule 14A the Company filed with the SEC on April 23, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Foroughi owned 2,091,464 shares of AppLovin Class A common stock and 27,936,907 shares of AppLovin Class B stock, representing 40.8% of Company shareholder voting power and thereby making him a controlling shareholder.

20.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Foroughi made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|

| | | | |
|---|---|---|---|
| December 9, 2024 | 50,000 | $349.88 | $17,493,850 |
| December 10, 2024 | 1,676 | $356.97 | $598,288 |
| December 10, 2024 | 43,522 | $337.25 | $14,677,794 |
| February 21, 2025 | 45,000 | $427.19 | $19,223,325 |
| February 24, 2025 | 600 | $396.93 | $238,155 |
| February 24, 2025 | 44,400 | $411.82 | $18,284,719 |

Thus, in total, before the fraud was exposed, Defendant Foroughi sold 185,198 shares of Company stock on inside information, for which he received approximately $70.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions and Application Misconduct were exposed, demonstrate his motive in facilitating and participating in the schemes.

21.    The 2024 Proxy Statement stated the following about Defendant Foroughi:

Mr. Foroughi is one of our co-founders and has served as our Chief Executive Officer and a member of our Board of Directors since December 2011.

He was designated as Chairperson of our Board of Directors in March 2021. He previously co-founded two advertising technology companies, Lifestreet Media Inc. and Social Hour Inc. Mr. Foroughi holds a B.A. in Business Administration from the University of California, Berkeley.

Qualifications

Mr. Foroughi was selected to serve on our Board of Directors because of his deep industry knowledge and the vision and experience he brings as our Chief Executive Officer and co-founder.

**Defendant Stumpf**

22.    Defendant Stumpf has served as the Company's CFO since January 2024. He previously served various roles at the Company starting in February 2020, most recently

having served as the Company's Vice President of Finance and FP&A from July 2022 until December 2023.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Stumpf made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| November 22, 2024 | 21,101 | $333.08 | $7,028,384 |

Thus, in total, before the fraud was exposed, Defendant Stumpf sold 21,101 shares of Company stock on inside information, for which he received approximately $7 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions and Application Misconduct were exposed, demonstrate his motive in facilitating and participating in the schemes.

24.     The 2024 Proxy Statement stated the following about Defendant Stumpf:
Mr. Stumpf has served as our Chief Financial Officer since January 2024 and prior to that served as our Vice President of Finance and FP&A since July 2022 and as our Senior Director, FP&A from February 2020 through June 2022. Prior to joining us, Mr. Stumpf worked at PricewaterhouseCoopers, an audit and assurance, consulting and tax services firm, from 2006 to 2020 in roles of increasing responsibility, including most recently as Transaction Services - Financial Due Diligence Director. He holds a B.A. in Business Management Economics from the University of California, Santa Cruz.

**Defendant Billings**

25.     Defendant Billings has served as a Company director since December 2020, and as the Lead Independent Director since February 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

26.     The 2024 Proxy Statement stated the following about Defendant Billings:

Mr. Billings has served as a member of our Board of Directors since December 2020 and as our Lead Independent Director since February 2021.

Mr. Billings has served as Chief Executive Officer and a member of the board of directors of Wynn Resorts, Limited (NYSE: WYNN), a developer and operator of hotels and casinos, since February 2022. Prior to February 2022, Mr. Billings served as the Chief Financial Officer and Treasurer of Wynn Resorts from March 2017 to January 2022 and as President from May 2019 to May 2021. He has also served as a Non-Executive Director of Wynn Macau, Limited, a majority owned subsidiary of Wynn Resorts since August 2018. From December 2015 to January 2018, Mr. Billings served as Non-Executive Chairman of NYX Gaming Group Ltd., a developer of digital gaming systems which was acquired by Scientific Games Corporation in January 2018. Mr. Billings has been a Certified Public Accountant since 1999. He holds a B.S. in Business Administration from the University of Nevada, Las Vegas and an M.B.A. from Columbia Business School.

Qualifications

Mr. Billings was selected to serve on our Board of Directors because of his significant operational experience as a public-company CEO, his deep financial expertise, and his industry knowledge.

**Defendant Chen**

27.     Defendant Chen has served as a Company director since August 2018. He also serves as an Advisor to the CEO of the Company, a role he has served since January 2024. Previously, Defendant Chen also served as CFO of the Company from November 2019 until December 2023.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Chen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 9, 2024 | 171,951 | $347.94 | $59,829,146 |
| December 9, 2024 | 400 | $365.44 | $146,176 |
| December 10, 2024 | 23,569 | $351.35 | $8,280,944 |

| December 10, 2024 | 194,080 | $334.23 | $64,867,552 |
| December 12, 2024 | 99,000 | $332.87 | $32,954,031 |

Thus, in total, before the fraud was exposed, Defendant Chen sold 489,000 shares of Company stock on inside information, for which he received approximately $166.1 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions and Application Misconduct were exposed, demonstrate his motive in facilitating and participating in the schemes.

29.    The 2024 Proxy Statement stated the following about Defendant Chen:

Mr. Chen has served as a member of our Board of Directors since August 2018.

Mr. Chen previously served as AppLovin's President and Chief Financial Officer from November 2019 to December 2023. Prior to joining us, he served as the head of Technology, Media and Telecom at Kohlberg Kravis Roberts & Co. L.P. (together with its affiliates, KKR) (NYSE: KKR), an investment firm that manages multiple alternative asset classes, from 2007 to 2019, having previously worked for the firm from 1995 to 1997. He also currently serves on the board of directors of GoDaddy, Inc. (NYSE: GDDY), an online solutions provider, and Internet Brands Inc., an integrated digital media and software services company. Mr. Chen holds a B.S. in Economics (Finance) and a B.S.E. in Mechanical Engineering from the University of Pennsylvania and an M.B.A. from the Stanford University Graduate School of Business.

Qualifications

Mr. Chen was selected to serve on our Board of Directors because of his extensive operating and management experience, his financial acumen and his knowledge of technology companies and his experience serving on the boards of directors of other public and private technology companies.

**Defendant Georgiadis**

30.    Defendant Georgiadis has served as a Company director since January 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

31.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Georgiadis made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| November 29, 2024 | 30,500 | $340.06 | $10,371,982.00 |

Thus, in total, before the fraud was exposed, Defendant Georgiadis sold 30,500 shares of Company stock on inside information, for which she received approximately $10.4 million in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions and Application Misconduct were exposed, demonstrate his motive in facilitating and participating in the schemes.

32.    The 2024 Proxy Statement stated the following about Defendant Georgiadis:

Ms. Georgiadis has served as a member of our Board of Directors since January 2021.

Ms. Georgiadis currently serves as Co-Founder and CEO of Montai Health, and as CEO-Partner of Flagship Pioneering Inc., a bioplatform innovation company, since April 2022. She previously served as an Endurance Partner-in-Residence at General Catalyst, a venture capital firm, from January 2021 to April 2022. From May 2018 to December 2020, she served as President and Chief Executive Officer of Ancestry.com LLC, a global family history and consumer genomics company. Prior to Ancestry, from February 2017 to May 2018, Ms. Georgiadis served as Chief Executive Officer of Mattel, Inc. (NASDAQ: MAT), a global children's entertainment company specializing in toys and consumer products. From 2009-2017 she served as President of Google Americas and the Vice President of Global Operations. She is an experienced public and private company board director and currently serves on the board of directors of McDonald's Corporation (NYSE: MCD) and several private companies in technology and health technology. She holds an A.B. from Harvard College and an M.B.A. from Harvard Business School.

Qualifications

Ms. Georgiadis was selected to serve on our Board of Directors because of her significant global operational experience, her public company board experience, and her financial expertise.

**Defendant Harvey Dawson**

33.    Defendant Harvey Dawson has served as a Company director since November 2021. She also serves as a member of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

34.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Harvey Dawson made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 6, 2024 | 500 | $406.63 | $203,314 |

Thus, in total, before the fraud was exposed, Defendant Harvey Dawson sold 500 shares of Company stock on inside information, for which she received approximately $203,314 in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions and Application Misconduct were exposed, demonstrate his motive in facilitating and participating in the schemes.

35.    The 2024 Proxy Statement stated the following about Harvey Dawson:

Ms. Harvey Dawson has served as a member of our Board of Directors since November 2021.

Ms. Harvey Dawson has served as the Chief Legal Officer and Corporate Secretary of HubSpot (NYSE: HUBS), a leading CRM platform, since November 2022, where she is responsible for overseeing the company's legal and compliance teams. Prior to joining HubSpot, she served as the Chief Legal Officer of Gusto, Inc., a modern HR platform, from August 2020 to November 2022, and on the executive leadership team, overseeing the company's legal, compliance and government affairs team. Previously, from June 2017 to July

2020, she was General Counsel at Sidewalk Labs, an urban innovation subsidiary of Alphabet Inc., where, among other things, she was responsible for developing the legal team and data privacy strategy. From 2011 to 2017 she oversaw global IP and licensing at HARMAN, a Samsung company, as its Vice President, Global Intellectual Property, and was Associate General Counsel at Netflix (NASDAQ: NFLX) from 2008 to 2011. Prior to Sidewalk Labs, she held senior legal positions with Netflix, and Autodesk (NASDAQ: ADSK). Ms. Harvey Dawson received her BA, cum laude, in Journalism from Michigan State University and was an Honors College member. She received her JD, cum laude, from Georgetown University Law Center. Ms. Harvey Dawson is also a board member of Make-A-Wish Connecticut and BSA | The Software Alliance.

Qualifications

Ms. Harvey Dawson was selected to serve on our Board of Directors because she has over 25 years of broad-based legal experience and has overseen corporate governance, corporate, M&A and commercial transactions, enterprise risk management, compliance, data privacy, intellectual property, regulatory and governmental/public affairs.

**Defendant Messing**

36.     Defendant Messing has served as a Company director since March 2024. She also serves as a member of Compensation Committee and the Nominating and Corporate Governance Committee.

37.     The 2024 Proxy Statement stated the following about Defendant Messing:

Ms. Messing has served as a member of our Board of Directors since March 2024.

Ms. Messing served as Chief Marketing & Communications Officer at Roblox (NYSE: RBLX) from August 2020 to December 2023. Prior to this role, Ms. Messing served as Senior Vice President, Chief Marketing Officer of Walmart U.S (NYSE: WMT) from August 2018 to August 2019, and brought her years of experience serving in multiple roles including Vice President and Chief Marketing Officer, and later Senior Vice President and Chief Marketing Officer at TripAdvisor, Inc. (NASDAQ: TRIP) an online travel company, between 2011 and 2018. Between 2002 and 2011, she served in a number of management positions at Hotwire.com, an internet-based travel agency,

including Vice President of Customer Experience and Vice President and General Manager, Travel Ticker.

Ms. Messing currently serves on the board of directors of Vacasa (NASDAQ: VCSA), a publicly-traded company with a leading platform for vacation rental management. She previously served on the board of directors of Overstock.com, Inc. (NYSE: BYON), a publicly-traded internet retailer, and the board of directors of publicly-traded XO Group, Inc., which merged with WeddingWire in December 2018. Ms. Messing received her B.A. from Northwestern University and her J.D. from Stanford Law School.

Qualifications

Ms. Messing was selected to serve on our Board of Directors because of her extensive experience in both management and director positions of public companies and because of her experience in online platforms and marketing.

**Defendant Morgenfeld**

38.     Defendant Morgenfeld has served as a Company director since September 2023. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

39.     The 2024 Proxy Statement stated the following about Defendant Morgenfeld:

Mr. Morgenfeld has served as a member of our Board of Directors since September 2023.

Mr. Morgenfeld held pivotal roles at Pinterest, Inc. (NYSE: PINS), including Chief Financial Officer and Head of Business Operations from November 2016 to July 2023. Before Pinterest, he left his mark at Twitter as Vice President of Finance from 2015 to 2016 and at Hewlett-Packard (NYSE: HPQ) as Treasurer and Senior VP of Financial Analytics and Corporate Development from 2013 to 2015. Prior to his role at Hewlett-Packard, he was an investment partner at Silver Lake Partners from 2004 to 2013. Mr. Morgenfeld currently sits on the board of directors of Urban Outfitters, Inc. (NASDAQ: URBN), a portfolio of global consumer brands comprising Urban Outfitters, Anthropologie, Free People, BHLDN, Terrain, Menus & Venues, and Nuuly. Mr. Morgenfeld graduated first in his class from the United States Military Academy at West Point and holds an M.B.A. from Stanford University Graduate School of Business.

Qualifications

Mr. Morgenfeld was selected to serve on our Board of Directors because of his extensive operational expertise, strong background in finance and insights into technology-driven enterprises, as well as his significant experience serving on the boards of other notable public and private companies.

### **Defendant Oberwager**

40.    Defendant Oberwager has served as a Company director since November 2019.

41.    The 2024 Proxy Statement stated the following about Defendant Oberwager:

Mr. Oberwager has served as a member of our Board of Directors since November 2019.

Mr. Oberwager joined KKR (NYSE: KKR) in 2008 where he is a Partner, Private Equity. Mr. Oberwager currently serves on the board of directors of several privately-held companies. Mr. Oberwager holds a B.A. in Classics from Georgetown University and an M.B.A. from Harvard Business School.

Qualifications

Mr. Oberwager was selected to serve on our Board of Directors because of his extensive experience as an investment professional and his experience serving on the boards of directors of other technology companies.

### **Defendant Vivas**

42.    Defendant Vivas has served as a Company director since August 2018.

43.    The 2024 Proxy Statement stated the following about Defendant Vivas:

Mr. Vivas has served as a member of our Board of Directors since August 2018.

Mr. Vivas has served as Chief Operating Officer at Humans, Inc., the developer of the Flip Shop social shopping app since March 2024. From August 2017 to March 2024, he served as the Chief Executive Officer at Curated, Inc. (Curated.com), an online outdoor sports retailer he co-founded.

From March 2014 to April 2017, Mr. Vivas served as Head of Product, Talent Solutions at LinkedIn Corporation, a business and employment-oriented online service. He joined LinkedIn through its acquisition of Bright.com, an employment website company he co-founded and served as Chief Product Officer from October 2011 to February 2014.

Qualifications

Mr. Vivas was selected to serve on our Board of Directors because of his deep industry knowledge and significant operational experience as an executive with technology companies.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

44.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of AppLovin and because of their ability to control the business and corporate affairs of AppLovin, the Individual Defendants owed AppLovin and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AppLovin in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AppLovin and its shareholders so as to benefit all shareholders equally.

45.     Each controlling shareholder, director, and officer of the Company owes to AppLovin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of AppLovin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the controlling shareholder, officers, and directors of AppLovin were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of their position as a controlling

shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of AppLovin, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

49.    As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.    To discharge their duties, the controlling shareholder, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such

duties, the controlling shareholder, officers, and directors of AppLovin were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to AppLovin's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AppLovin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AppLovin and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AppLovin's operations would comply with all applicable laws and AppLovin's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.    Each of the Individual Defendants further owed to AppLovin and the shareholders the duty of loyalty requiring that each favor AppLovin's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52.    At all times relevant hereto, the Individual Defendants were the agents of each other and of AppLovin and were at all times acting within the course and scope of such agency.

53.    Because of their advisory, executive, managerial, directorial, and controlling positions with AppLovin, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AppLovin.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.    The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

57.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AppLovin was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AppLovin and was at all times acting within the course and scope of such agency.

## APPLOVIN'S CODE OF CONDUCT

60.    AppLovin's Code of Conduct and Business Ethics (the "Code of Conduct")

represents that it "was adopted to further AppLovin's commitment to conducting its business with honesty and integrity." The Code of Conduct goes on to state that it "applies to all directors, officers and employees of the Company (who, unless otherwise specified, are collectively 'employees'), as well as contractors and consultants of the Company."

61.    In the section "Financial Reports and Other Records - Disclosure" the Code of Conduct states:

> Employees, contractors and consultants are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the Company. The Company expects all of its employees, contractors and consultants to take this responsibility very seriously to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

> Each employee, contractor and consultant, to the extent involved in the Company's disclosure process, including without limitation, the principal executive officer, principal financial officer and other senior employees who perform similar functions in the Company (collectively, "Senior Financial Officers"), must familiarize themselves with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, all books, records, accounts and financial statements must conform both to applicable legal requirements and to the Company's system of internal controls. All assets of the Company must be carefully and properly accounted for. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation and authorization. Misclassification of transactions as to accounts, business units or accounting

periods is forbidden. Each employee, contractor and consultant bears responsibility for ensuring that they are not party to a false or misleading accounting entry.

62.    In the section "Conflicts of Interest," the Code of Conduct states, in relevant part:

A conflict of interest is any activity or interest that is inconsistent with or opposed to the best interests of the Company. Your decision and actions in the course of employment or other relationship with the Company should be based on the best interests of the Company and not based on personal relationships or benefits. You must never use or attempt to use your position with the Company to obtain improper personal benefits. Any situation, transaction or relationship that may give rise to an actual or potential conflict of interest must be disclosed to the Company and shall be avoided, unless approved by the Company.

63.    In the section "Protection of Assets, Confidentiality & Communications" the Code of Conduct states:

You should endeavor to protect the Company's assets and ensure their efficient use. Any suspected incident of fraud or theft should be reported immediately to your immediate supervisor or manager or other appropriate Company personnel for investigation.

In carrying out the Company's business, you may learn confidential or proprietary information about the Company, its customers, suppliers or business partners. Confidential or proprietary information of the Company, and of other companies, includes any non-public information that would be harmful to the relevant company or useful to competitors if disclosed.

You must maintain the confidentiality of information about the Company and other companies entrusted to you by the Company, use the information only for permissible business purposes and in accordance with any restrictions imposed by the disclosing party, and limit dissemination of the confidential information, both inside and outside the Company, to people who need to know the information for business purposes and who are bound by similar obligations of confidentiality, unless disclosure is authorized or legally mandated.

The obligation to protect confidential information does not end when you terminate your relationship with the Company. Any questions about whether

information is confidential should be directed to AppLovin's Legal Team.

If you are contacted by a member of the financial community, the press or any other outside organization or individual seeking information about the Company other than in the ordinary course of business, you should consult with AppLovin's Chief Marketing Officer prior to responding. This includes, among other things, answers to questions in overall business trends, business in different geographies, pricing, suppliers, new offerings or technologies and lawsuits or disputes.

64.    In the same section, under the subheading "Compliance with Laws, Rules & Regulations" the Code of Conduct states, in relevant part:

You must respect and obey all laws when carrying out responsibilities on behalf of the company and refrain from illegal conduct.

You have an obligation to be knowledgeable about specific laws, rules and regulations that apply to your area of responsibility. If a law conflicts with a policy in this Code, you must comply with the law.

* * *

6. Insider Trading

Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because you will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which we do business could constitute insider trading and could violate the law, as could giving material nonpublic information to others who trade on that information. It is your responsibility to comply with these laws and not to share material non-public information. We have also adopted an Insider Trading Policy with which you must comply. For more information about insider trading laws, please reference our Insider Trading Policy, which can be found on the Company's internal website.

65.    In the section "Compliance and Reporting," in which the Code of Conduct states, in relevant part:

2. Reporting Violations

If you know of or suspect a violation of this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), you must report it immediately to AppLovin's Legal Team.

All reports will be kept confidential, to the extent practical, except where disclosure is required to investigate a report or mandated by law. The Company does not permit retaliation of any kind for good faith reports of violations or possible violations.

66.    In the section "Waivers of this Code," in which the Code of Conduct states:

Any amendment or waiver of any provision of this Code must be approved in writing by AppLovin's Chief Legal Officer or Chief Financial Officer, and promptly disclosed pursuant to applicable laws and regulations. Any waiver or modification of this Code for a Senior Financial Officer will be promptly disclosed to stockholders if and as required by applicable law.

67.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Application Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, five of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $254.2 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## APPLOVIN'S AUDIT COMMITTEE CHARTER

68.    AppLovin also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

The purpose of the Committee is to assist the Board in fulfilling its responsibilities for overseeing:

- The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.

- The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

- The design, implementation and performance of the Company's internal audit function.

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

- The Company's policies with respect to risk assessment and risk management pertaining to the: financial, accounting and tax; technology, including artificial intelligence (AI), and information security, including cybersecurity; and data privacy and protection matters of the Company.

69.    Under the heading "Responsibilities," the Audit Committee Charter states the following:

The following are the principal recurring responsibilities of the Committee. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations and as the Board may request.    In carrying out its responsibilities, the Committee believes its

policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.

70.    Under the same heading, in a subsection titled "Review Financial Statements" the Audit Committee Charter states the following, in relevant part:

The Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

71.    Under the same heading, in a subsection titled "Earnings Press Releases and Earnings Guidance" the Audit Committee Charter states the following:

The Committee will review, in general, earnings press releases, and review

and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

72.    Under the same heading, in a subsection titled "Internal Controls" the Audit Committee Charter states the following:

The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

73.    Under the same heading, in a subsection titled "Disclosure Controls and Procedures" the Audit Committee Charter states the following:

The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

74.    Under the same heading, in a subsection titled "Internal Audit" the Audit Committee Charter states the following:

The Committee shall review with the independent auditor a discussion of management's plans with respect to the responsibilities, budget and staffing of the internal audit function and the Company's plans for the implementation of the internal audit function.

75.    Under the same heading, in a subsection titled "Risk Assessment and Risk Management" the Audit Committee Charter states the following:

The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to: financial, accounting and tax; technology, including AI, and information security, including cybersecurity; and data privacy and protection matters. The Committee will also review the Company's risk management framework and programs to address risks, including a review of the Company's network security program and controls with the Company's Head of Information Security and Compliance and evaluate the adequacy of the Company's data privacy compliance program with the Chief Legal Officer or Head of Privacy, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

76.    Under the same heading, in a subsection titled "Legal and Regulatory Compliance" the Audit Committee Charter states the following:

The Committee shall:

- Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct and Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

- Discuss with a senior member of the Company's Legal Team any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

77.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Application Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

78.    AppLovin provides a software-based platform for advertisers that strengthens the marketing and monetization of advertising content within the United States and around the world.

79.    The Company reports operating results through two segments. The first is its Advertising, or Software Platform, segment, which offers end-to-end AI supporting advertising solutions, which customers can use to reach, monetize, and grow their audiences. The second is the Apps segment, in which the Company operates its vast array of owned mobile apps.

### **Application Misconduct**

80.    Between 2022 until at least late 2024, the Company discovered a code that allowed it to download applications directly onto people's phones without their knowledge or approval.

81.    As would be revealed at the end of the class period, this code granted the Company's apps the ability "to 'bind' to AppHub, effectively borrowing or inheriting

AppHub's one-click direct install permissions as their own. This permission is presently embedded within many of the most popular free-to-play games in the world, including Subway Surfers, 8 Ball Pool, Wordscapes, and Angry Birds 2."

82.    Additionally, at the same time the Company was breaking down and taking advantage of data from Meta Platforms in order to give the illusion that the Company's e-commerce segment was performing better than it actually was

## FALSE AND MISLEADING STATEMENTS

### *May 10, 2023 Press Release*

83.    On May 10, 2023, the Company issued the Q1 2023 Earnings Release. The Q1 2023 Earnings Release announced the growth initiatives the Company was taking, stating:

> In the first quarter of 2023 we continued to execute against our growth initiatives and exceeded the top end of our guidance. After substantially completing our cost and Apps portfolio optimization projects, our team is focused on three key growth initiatives within our Software Platform segment: 1) upgrading our core machine learning AXON technology; 2) expanding our ad solutions into Connected-TV; and 3) extending our marketing platform to carriers and OEMs.

### *May 10, 2023 Earnings Call*

84.    That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter results (the "Q1 2023 Earnings Call").

85.    During his scripted remarks on the Q1 2023 Earnings Call, Defendant Foroughi explained improvements made to the AXON platform before discussing the development of AXON 2.0, stating:

> Upgrading from AXON 1 to 2 is no different than OpenAI moving from ChatGPT 3 to 4. Our models can always be improved, and our entire business is powered by the evolution of our technology. The enhancements to our machine learning and AI are not a onetime thing, but a series of upgrades over time. As we make these, there is the potential for significant lifts to both

revenue and cash flow. We are currently in the midst of a staged rollout of AXON 2, and we are very excited about the long-term potential of this new technology for our partners and our business.

86.    During the question-and-answer portion of the Q1 2023 Earnings Call, analysts asked multiple questions about AXON 2.0. For example, in response to one question about how AXON 2.0 will perform as a driver for performance, to which Defendant Foroughi responded:

*Zhihua Yank – Oppenheimer & Co.*: My first question is on the strength for software platform. And how much did AXON 2 -- will always AXON 2 a meaningful driver for that performance sequentially?

*Defendant Foroughi*: ***And really AXON 2 we talked about, we're now in the midst of a stage rollout, so that came after the quarter. In Q1, we did see improvements in our core technology, the AXON 1.0 version. And incremental improvements in our technology is fundamentally core to our business on an ongoing basis. We also saw more confidence from advertisers spending on our platform as they were seeing good results. And the mindset in the ecosystem is starting to return back to growth. We're seeing good industry momentum as well.***[1]

87.    In response to another analyst's question regarding the Company's growth for the upcoming year, Defendant Foroughi responded:

*Ralph Edward Schackart – William Blair & Company L.L.C.*: Maybe kind of leading to the software business. You talked about the strong growth, and it seems like the market is sort of stabilizing. I know you're not giving full year guidance, but anything that you're seeing currently that would preclude this growth rate sort of persisting through 2023? Or just sort of broadly speaking, how should we think about growth this year on the software business?

*Defendant Foroughi*: We're really looking at it to sort of building blocks. Last year, obviously, it was difficult for the whole ad ecosystem and the economy in general. Now we're -- we've got one good quarter in place. ***The biggest change for us in our business today is we're rolling out AXON 2. It's a***

---

[1] Unless stated otherwise all emphasis added.

*material upgrade of our core platform, and we're really excited about it. The team working on this is phenomenal. And so getting this out to market could become a catalyst for our own growth.*

*But we've always talked about our position in this market is quite large in the mobile gaming ecosystem. So if we're able to become more efficient, we'll create growth across the whole sector. And that's what we're really excited about. We think this -- if it continues to go well as we roll this out throughout the rest of the year, we'll be able to create growth in this ecosystem irregardless of what's going on around us.*

88.    Lastly, in response to an analyst's question regarding AXON 2's efficiency compared to the original AXON platform, Defendant Foroughi responded:

*Franco Rafael Granda Penaherrera – D.A. Davidson & Co.*: I'd like to reference AXON 1 as the same way as AMD references its architectures by saying that they age like fine wine. Are you approaching AXON 2 in a similar way where the efficiency continues to build on top of itself as you continue to iterate on it?

*Defendant Foroughi*: Yes. I mean the world we live in today with these AI technologies is the fastest evolution and change in technology we've ever seen in our lifetimes. *The rate of innovation is just incredible. And so as we go to AXON 2, there's, on an ongoing basis, incremental improvements that we can make to the platform. That will fuel our business for some time. And then there's the incremental uptick to AXON 3 and then AXON 4 and AXON 5. This core expertise is going to drive our business for a very, very long time. These technologies are only going to get more powerful. And because of our market-leading position, we've got so much volume flowing through our systems that efficiency gains from these technologies, as they evolve, will generate lifts to revenue. And we've always talked about how our software business technology drive lifts to revenue and a very high flow-through, and that's what we're excited about*.

### 2024 Proxy Statement

89.    On April 23, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing,

Morgenfeld, Oberwager, and Vivas solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

90.    The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas to the Board; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2024 (the "2024 Fiscal Year").

91.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

> Our Board of Directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, including independence standards, and corporate governance policies and standards applicable to us in general. In addition, our Board of Directors has adopted a Code of Conduct and Business Ethics that applies to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. The full text of each of our Corporate Governance Guidelines and our Code of Conduct and Business Ethics is posted on our website at www.investors.applovin.com. We will post amendments to our Code of Conduct and Business Ethics or any waivers of our Code of Conduct and Business Ethics for directors and executive officers on the same website or in filings under the Exchange Act.

92.    Regarding the "Role of Board in Risk Oversight Process," the 2024 Proxy Statement stated the following:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational, in the pursuit and achievement of our strategic objectives. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and compliance, cybersecurity, and financial risks, while our Board of Directors, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed, as well as to foster a corporate culture of integrity. Consistent with

this approach, our Board of Directors, directly and through its committees, regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team and/or its advisors at each of its regular Board and committee meetings. Our Board of Directors also receives regular reports on all significant committee activities at each regular Board meeting, and evaluates the risks inherent in significant transactions.

As part of this approach, our Board of Directors considers both the materiality of a risk and its immediacy in making strategic decisions and helping management prioritize resources.

In addition, our Board of Directors has tasked designated standing committees with oversight of certain categories of risk management. Our Audit Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, as well as information security, including cybersecurity, data privacy and protection matters, legal and regulatory compliance and potential conflicts of interest. Our Audit Committee also, among other things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting, and tax matters. Our Compensation Committee assesses risks relating to our executive compensation plans and arrangements, administers our compensation recovery policy, and assesses whether our compensation policies and programs have the potential to encourage excessive risk-taking. Our Nominating and Corporate Governance Committee assesses risks relating to our corporate governance practices, our people, our communities and our planet (climate change) through our environmental, social and governance ("ESG") initiatives, the independence of the Board of Directors, and corporate succession plans for our executive officers. These committees receive regular updates from the management team as well as its advisors on various risk topics and regulatory developments applicable to the Company's operations and business, and provide regular reports on our risk management efforts to the full Board of Directors.

Our Board of Directors and its committees engage outside advisors and experts from time to time to assist in understanding market trends, regulatory changes and our risk environment in general. Our Board of Directors believes

Verified Shareholder Derivative Complaint

its current leadership structure supports the risk oversight function of the Board of Directors.

93.     Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) neither the AXON 2.0 platform nor the Company's "cutting-edge AI technologies" were responsible for the Company's ability to better match advertisements to mobile games; (2) in fact, the Company was actually taking advantage of advertising data from Meta Platforms; (3) the Company was also participating in manipulative practices to force unwanted apps on customers through a "backdoor installation scheme; (4) this "backdoor installation scheme" artificially inflated the Company's installation numbers on its applications; and (5) as a result of the foregoing, the Company's profits were artificially inflated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

94.     The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

95.     Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*May 8, 2024 Press Release*

96.     On May 8, 2024, the Company issued a press release announcing the financial and operational results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). In discussing the Company's performance drivers in the first quarter, the Q1 2024 Earnings Release stated:

> The first quarter marked a strong start to 2024 with outstanding business performance driven by the continued improvement of our AXON technology. We were encouraged to see improvement in the app advertising market with another quarter of year-over-year market growth and a continued shift to real-time bidding. By continuing to innovate and improve our AXON technology, we remain committed to driving growth not just for our company, but for the entire ecosystem we support.

97.     In discussing the growth of the Software Platform segment in the first quarter, the Q1 2024 Earnings Release stated:

> Our Software Platform segment grew significantly in the first quarter with Software Platform revenue of $678 million, up 91% year-over-year driven by further improvement of our AXON technology, which continues to benefit from ongoing self-learning, additional data, and engineering enhancements. Our technology improvements contributed to greater return on ad spend (ROAS) for our advertisers, leading to increased investment.

*May 8, 2024 Earnings Call*

98.     That same day, the Company hosted an earnings call with investors and analysts to discuss the first quarter results (the "Q1 2024 Earnings Call").

99.     During his scripted remarks on the Q1 2024 Earnings Call, Defendant Foroughi touted the Company's strong growth, attributing it to AXON's improved performance, stating:

> With AXON 2 turning 1 year old and achieving nearly a full recovery in our share price, after a very difficult 2022, I wanted to reflect on some key themes that we've consistently stated and now actively proven out.

We believe our culture is unique. By staying lean and retaining key contributors, we have built an exceptionally high performing team of subject matter experts capable of innovating faster and more effectively than those at other companies. We believe our business is not limited by the size of the mobile gaming market, but rather that our business can drive market growth. Advertisers have increased their spend on our platform as a result of the improved performance from AXON.

***First, a key driver of our growth will be the ongoing improvements to AXON. Our models are still in an early stage and will continue to improve themselves. But more importantly, our teams are still finding ways to materially improve these algorithms. While these gains may not be predictable, they may sometimes lead to quarters like Q1 where we far exceed expectations. Second, there is nothing that limits our models to just gaming. By expanding into web-based marketing and e-commerce, we expect our AI models to improve with added demand diversity. As we continue to execute on the previously discussed themes, we expect to see further growth in our business.***

100.    During his own scripted remarks on the Q1 2024 Earnings Call, Defendant Stumpf highlighted the Company's revenue growth in the first quarter, stating:

***Our software platform also benefited from technology improvements, including ongoing self-learning, additional data and enhancements by our engineering team. We continue to be optimistic about our ability to drive compounding efficiencies leading to improved performance for our advertising partners***. Our Apps portfolio remained stable from last quarter, maintaining 15% adjusted EBITDA margin.

Turning to our second quarter guidance. We expect to deliver between $1.06 billion and $1.08 billion in revenue. Adjusted EBITDA is expected to be within the range of $550 million and $570 million. That represents an adjusted EBITDA margin between 52% and 53%. In conclusion, we continue to have confidence in our ability to drive growth from our core business while we work to expand our long-term opportunities.

101.    Later in the Q1 2024 Earnings Call, during the question-and-answer session, Defendant Foroughi answered a number of questions pertaining to how AXON 2.0 has

caused the growth the Company has seen in the last year. For example, in response to one analyst's question regarding key sources of the Company's performance in the first quarter, Defendant Foroughi stated:

> *William Lampen – BTIG, LLC*: You mentioned in the prepared remarks that this quarter results exceeded your internal expectations. Is there anything specific that you might call out for us amongst the sort of key sources of outperformance? And then I guess sort of second and bigger picture, as we think about the trajectory for software and AppDiscovery after a couple of quarters of really strong sequential revenue growth, I think there's some concern percolating that once we anniversary the start of the AXON cycle that maybe growth starts to asymptote. Could you help us frame up, I guess, current momentum and the runway that you see within both the core gaming market and new channels like e-commerce?

> *Defendant Foroughi*: So on the first one, I touched on this in the script. ***But we've got a few growth vectors. One is going to be adding more advertisers both within gaming and then breaking out to these new verticals that we're working on and quite excited about. Secondarily and more importantly, anytime we see improvements in our core models, we see gains in our business. And there's 2 forms of improvements. These models are self-learning. So we've got them in the marketplace. We're serving a ton of impressions every single day. And there's a feedback loop that gets this data back into the model and it improves itself. So there's a component of that. That's why the system continues to get better since we launched it***.

> And the second piece is our team, obviously, is still working every single day. So every time our research science team creates some sort of innovation or breakthrough on those models, that ends up a step function gain in the business. Because if you think about these models, it's all math and if the math gets more accurate, then we're going to see a gain in the business. And these are very high-margin gains because there's no cost associated with that gain, there's no sales process to go bank that gain, it's just a gain in the business. And so I try to tie it back to the first quarter and performing really well against obviously the toughest quarter in advertising against Q4. The gain we saw in the first quarter was predominantly due to just enhancements to the models themselves. And so that's going to be one of our core drivers going forward.

> Now to the question of the software growth is slow, look, software is growing

about 90%, 100% year-over-year, and it's a 73% margin business. So we don't need it to grow double every single year. It's a net revenue reported business on the vast, vast majority of the revenue. So every incremental dollar is very, very high margin.

* * *

Now we're the best in the world today at driving value to mobile gaming advertisers, and there's nothing that limits our technology from working outside gaming, how good could we be in other verticals. So the vertical expansion is a key part of our focus. And then beyond that, we're in the business of creating improvements to our technology. So if you start adding all that up, how do we keep growing this business, there's a lot of levers that we have to pull to be really excited. And that's why it ended with we've never been more excited about the prospects we have in front of us than we are today.

102.    In response to another analyst's question regarding efforts the Company has made to match advertisements outside of the gaming space, Defendant Foroughi responded:

*Ralph Edward Schackart – William Blair & Company*: You've been fairly consistent in saying that AXON 2 engine works outside sort of the gaming vertical, and you sort of touched on that in your last response. Can you maybe give an update sort of where you are in that sort of effort outside of gaming? Do you need a new sales force? Are you testing? Any results you could share, sort of want to get a sense of sort of where you are in that effort.

*Defendant Foroughi*: And a couple of things. One is, we look at the advertising world with apps and websites, right? Like there's 2 forms of media that people are buying to the end destination. And today in the app marketing world, we're very good at gaming. ***We also work with nongaming apps, and we've seen success once we rolled out AXON 2 across a variety of nongaming companies growing on our platform, too. And I think last call, we touched on that the non-gaming app space is growing faster than the gaming app space on our platform just because it starts from a lower base.***

***That success hasn't changed. We still see the same trajectory. Now what has us excited and what we've been working on is launching the first form of***

*web advertising on our platform. And if you think about a lot of transactional industries, e-commerce, in particular, most of the transactions are still done on the website, not the mobile application because a lot of shops don't even have a mobile application. And so that's been work we've been doing. We will be bringing that product to market this quarter, and it's something we're very, very excited about as a way to really build out a lot more demand density into our platform.*

103.   In response to an analyst's question pertaining to the Company's sales process, Defendant Foroughi stated:

*Jason Boisvert Bazinet – Citigroup Inc.*: Would you mind just giving us an update on your sales process? I remember several years ago, you sort of made fun of yourself because you didn't really have a sales force and didn't think about it. And I'm just trying to get a sense. You haven't talked about it as a vector. But is all of this growth we're seeing a function of sales and the technology? Or is it just purely the technology and it's sort of selling itself based on the return...

*Defendant Foroughi*: **We believe if we build great products and we innovate well, that if the advertisers are seeing success on our platform, they're going to tell their peers and their peers are going to come to our platform and this thing could self-sell itself. And we've seen that happen in mobile gaming as AXON 2 continues to perform well**.

\* \* \*

When we look at outside of gaming, we're still -- we have no interest in getting into brand advertising. So everything is performance-based. We fundamentally want to play -- replay the same playbook, where we're not going to invest heavily in sales now. In some of these transactional categories outside gaming, you do need some presence, some marketing, some sales, but it's not going to be a heavy investment.

**And we do believe that if we're able to go drive the same result where, for instance, in e-commerce to shop, see a lot of benefit from marketing on our platform and they can measure the result and they see a stronger result on our platform and some of the other channels they buy on, there's going to be a lot of interest because these other transactionally charged categories desperately need more marketing available to them as those industries are**

***struggling to grow themselves***.

104.    Lastly, in response to a question regarding net revenue for install growth, Defendant Foroughi stated:

*Omar Dessouky – Bank of America Securities*: I didn't see net revenue for install growth on your letter. Could you update us on that and give us any kind of the puts and takes around that?

*Defendant Foroughi*: ***But similar to prior quarters, we've had an increase in both the net revenue per install as well as the volume of installations, and that's through the continued improvement of AXON that we've been talking about. As the technology continues to improve, we should see both a growth in the amount of money that we're making per installation and volume of install as we see more advertisers increasing their spend.***

### November 6, 2024 Press Release

105.    On November 6, 2024, the Company issued a press release announcing the Company's financial results for the third quarter of the 2024 Fiscal Year (the "Q3 2024 Earnings Release").

106.    In discussing the success of the AXON platform, the Q3 2024 Earnings Release stated:

Our AXON models continue to improve through self-learning and, more importantly this quarter, from technology enhancements by our engineering team. As we continue to improve our models our advertising partners are able to successfully spend at a greater scale. We're proud to be a catalyst to reinvigorating growth in our industry.

107.    In discussing the financial results for the Software Platform segment, the Q3 2024 Earnings Release stated:

Our Software Platform segment continued to grow in the third quarter, with Software Platform revenue of $835 million, up 66% year-over-year, driven by continued development of our AXON engine through ongoing self-learning and directed model enhancements. These technology enhancements allowed

our advertising partners to further increase the scale of their spend on our platform while consistently achieving their return on ad spend ("ROAS") goals.

### November 6, 2024 Earnings Call

108.   That same day, the Company hosted an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2024 Earnings Call").

109.   During his scripted remarks on the Q3 2024 Earnings Call, Defendant Foroughi highlighted the Company's growth, attributing it to the improvements made to the AXON algorithm and AI software. Defendant Foroughi stated, in relevant part:

> We continue to execute well, expanding our core business and laying the groundwork for its sustained growth. Last quarter, I shared our confidence in achieving 20% to 30% year-over-year growth for the foreseeable future. We continue to expect 4% to 5% quarterly growth through self-learning and market growth, with occasional step changes resulting from enhancements to our AXON algorithm.
>
> ***This quarter, we saw one of those step changes, with meaningful growth driven by advancements to AXON. While we can't predict the timing of these breakthroughs, we are in the early stages of AI software development, both within our company and in the broader industry. We expect ongoing research advancements to continue driving our technology forward***.
>
> While we remain confident in 20% to 30% growth for mobile gaming advertisers alone, we're also exploring new areas, as shown by our recent ecommerce pilot. Early data has exceeded our expectations, with the advertisers in the pilot seeing substantial returns, often surpassing those from other media channels and, in many cases, experiencing nearly 100% incrementality from our traffic.

110.   During his own scripted remarks on the Q3 2024 Earnings Call, Defendant Stumpf discussed the Company's third quarter revenue growth, also attributing it to the improvements made to AXON, stating:

> ***During the quarter, improvements in our AXON technology, driven by***

*ongoing self-learning, and enhancements by our engineering team contributed to further growth of our software platform*. This segment generated $835 million in revenue and $653 million in adjusted EBITDA, achieving a 78% margin and growing 66% in revenue and 79% in adjusted EBITDA from the same period last year. Quarter-over-quarter flow-through from revenue to adjusted EBITDA was 107%.

\* \* \*

Our Apps revenue for the quarter was $363 million, a 1% increase from last year, with $68 million in adjusted EBITDA representing a 19% margin. We continue to expect the Apps business to be stable in the future. We believe a strong capital structure and effective capital allocation plan are crucial to the creation of long-term shareholder value. To that end, we're focused on a few areas.

111.    During the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Foroughi answered questions about the Company's expansion into e-commerce through AXON 2.0. For example, in response to one analyst's question about other opportunities for the Company outside of gaming, Defendant Foroughi stated:

*Matthew Andrew Cost – Morgan Stanley*: If you can move beyond gaming, do you believe you can move to other verticals?

*Defendant Foroughi*: 10 years from now, we think every advertiser that has a transactional model, whether it's collecting an e-mail address for a newsletter or a local pizza shop or an e-commerce brand or a gambling brand or a gaming brand or anything across any category, can buy on our platform and do it at scale. So there's no limitation to the power of the math and the technology that we've written.

*But the only limitation, the only reason why we referenced it as ecommerce today is the go-to-market. We do want to be thoughtful about how we penetrate new categories. But even inside e-commerce, we're not approaching it as we're only going to go to fashion and then we're going to go to beauty. We're approaching it as we're going to go to the entirety of e-commerce, and then we're going to go to the entirety of the rest of the categories of advertising that matter. And then hopefully, we're going to go to the whole world of transactional businesses over time*.

112.    In response to a question about the Company's potential move into e-commerce, Defendant Foroughi stated:

*Vasily Karasyov – Cannonball Research*: So can you help us understand this e-commerce opportunity?

Is it just taking AXON 2.0 as it is and just making minor tweaks so that it just selects for targeted potential e-commerce customers? Or is it a big overhaul? And then how much of an advantage will you be able to take from the gaming and take it to e-commerce? And who -- if you can, whom will you be competing against? Who is currently taking up those budgets?

*Defendant Foroughi*: So starting with like competition. I don't think, to date, anyone has delivered a solution inside mobile games for categories outside of gaming. And so we're going into greenfield. And what's exciting about these shops, and I said this on my talk track, when they're marketing on our platform today, this is a new audience.

**They're not otherwise able to reach this audience in that moment in time. So when we're able to show an ad for them and do it precisely and measure it all, there's an immense amount of incremental value for them from that advertisement. So it's a really strong solution for them**.

**So it will continue to make our platform able to monetize that audience better, which is going to be a huge boon for our business and very healthy for the publisher as well, who will generate more dollars from their users, but also get more diversity of content to their users. And in this case, if you're a game publisher, an e-commerce ad is not for someone who is building another game, it's for something that is completely different than your product. So it's a great win-win for all parties involved**.

**On the technology side, I never like to talk about complexities of technology. I certainly wouldn't say anything we do is simple. I don't think a lot of people in the world, I mean, maybe hundreds, max, engineers understand how to build these types of platforms. We've seen very few, only a handful of software implementations that are compelling at scale inside what we're calling these AI technologies, and we're one of those**.

And our engineers are building really complicated technologies that can do a

Verified Shareholder Derivative Complaint

lot more than just the first implementation did, which was drive performance marketing to gaming. So we think there's going to be a lot of expansion opportunity over time. The technology platform is really powerful, and math is not limited to categories. So there's going to be, I think, years of growth ahead of us.

113.   Lastly, in response to a question about how the Company's customers have responded to AXON 2.0, Defendant Foroughi stated:

*Zhihua Yang – Oppenheimer & Co.*: On gaming, do you think your customers are responding pretty consistently to step-up in AXON 2.0's performance? Is there certain customers that will ramp up spending faster than the others?

*Defendant Foroughi*: No. ***Like I said, it's the most exciting product that we've ever launched. We've never seen this kind of data on a new product. And if you recall, I mean, I don't voice optimism much since we've gone public on new products. We've talked about a lot of products. We are a very entrepreneurial company. We will try a lot of things. But the last time I talked about a really good product was when we launched AXON 2.0. That turned out pretty good for us, our company, our partners and our investors***.

***So if we're talking about this product as being the most compelling one we've seen yet, that you can assume we're not running into bottlenecks, other than like we just don't have the capacity yet in terms of human capital and every solution component automated to scale it out as quickly as the market demands. So we've got to line out the door of companies that want to jump on to this platform***.

***February 12, 2025 Press Release***

114.   On February 12, 2025, the Company issued a press release announcing its financial results for the fourth quarter and year-end of the 2024 Fiscal Year (the "FY 2024 Earnings Release").

115.   The FY 2023 Earnings Release revealed that during 2024 the Company experienced a 75% increase in revenue in the advertising segment, which the FY 2024 Earnings Release attributed to the use of automation, stating:

From the outset, we committed to building products that not only automated marketing but also delivered measurable incremental earnings. We wanted to design a platform to help our customers spend every dollar on acquiring users profitably and transparently. This principle continues to guide the innovations we deliver to our partners.

***These principles were on full display in 2024, a year that not only brought significant growth— marked by a remarkable 75% increase in revenue in our advertising business1—but also showcased the transformative potential of AI and automation. We've spent several quarters optimizing our teams to embrace automation, knowing the world is moving in this direction. We believe those who view these technologies as allies, rather than threats, will unlock extraordinary potential and we aim to lead by example.***

116.    The FY 2024 Earnings Release also laid out the initiatives the Company was planning to implement in 2025, stating:

As we look ahead to 2025, I'm excited by several key initiatives that will drive our next phase of growth:

1.  Advancing Our Models We are still in the early stages of improving our advertising AI models. The roadmap ahead is filled with opportunities for iteration, and as we execute, we believe we can continue to drive value creation for our shareholders.

2.  Personalizing Ad Experiences Our ad experience today is static, where users see similar looking advertisements created by humans. With AI, we aim to scale this process exponentially by creating countless iterations and dynamically selecting personalized creatives for each user. This will unlock improved consumer engagement and response.

3.  Automating Our Dashboard In 2025, we plan to launch a self-service dashboard powered by AI agents to help our customers manage their campaigns.

117.    The FY 2024 Earnings Release also quoted Defendant Foroughi, who highlighted how the Company's growth has been driven through the use of AI, stating:

Over the last few years, our team has achieved extraordinary things. ***We've***

*built an advertising model as powerful as any advertising AI model in the world, delivering measurable success for our partners. Early adopters in gaming and direct-to-consumer commerce have already seen the impact of our technology, and our mission is clear: to onboard every business that wants to drive measurable growth*.

We are driven by the belief that our technology can positively impact the global economy. By helping businesses of all kinds efficiently connect with their audiences, we unlock their potential to grow and thrive.

*February 12, 2025 Earnings Call*

118.  That same day, the Company hosted an earnings call with investors and analysts to discuss the fourth quarter and year-end results (the "FY 2024 Earnings Call"). On the FY 2024 Earnings Call, Defendant Foroughi highlighted the gains the Company has experienced since upgrading to AXON 2.0, stating:

Q4 was a major milestone, arguably our most foundational period since the AXON upgrade in 2023. For the first time, we captured meaningful holiday shopping advertising dollars and witnessed the impact of an advertising category beyond solely gaming contributing to our growth. I'm sure many of you are curious about how much revenue our e-commerce category contributed.

In line with this expanding focus on advertising, we've been assessing how best to invest our resources to serve the needs of a global client base. Seven years ago, we began acquiring gaming studios to help train our earliest machine learning models, an invaluable step in shaping the AI that underpins our AXON platform. However, we've never been a game developer at heart. We have immense respect for the creativity it takes to build games, including from teams in our studios.

119.  During the question-and-answer portion of the FY 2024 Earnings Call, Defendants Stumpf and Foroughi responded to one analyst's question regarding the Company's shift to e-commerce, stating:

*Ralph Edward Schackart – William Blair*: But just in terms of e-commerce, obviously, a lot of excitement here, and things seem to be going really well.

Do you still -- I think, before, you've talked about it contributing to be a material contribution in 2025.

*Defendant Stumpf*: **We still feel very confident, Ralph, in the ability for us to contribute a material portion of revenue from the e-commerce opportunity in 2025**. But again, it's very difficult to predict when and how much that growth is going to come in during the period in 2025. So I think we'll see it when it comes, and then we'll provide more details there.

*Defendant Foroughi*: And then what I've given consistently is, look, our business predictably has got 20% year-over-year growth in it. And that's from just the baseline of operating within the category that we've always traditionally operated.

And then you've got these things that can drive material upside that's really exciting for us. They're unpredictable. And when things are unpredictable, a lot of times people assume they're going to be unpredictably bad. **Well, in our business, we've got 2 things that could be unpredictably really good. One is these model enhancements. We're really, really early still in AI development and research, both inside our company and then obviously externally, too. This is not a field that's mature. It's early in its existence. It's only going to get better. And when our models get better, we've all seen the impact to revenue**.

120.    The statements in ¶¶83-88, 96-119 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) neither the AXON 2.0 platform nor the Company's "cutting-edge AI technologies" were responsible for the Company's ability to better match advertisements to mobile games; (2) in fact, the Company was actually taking advantage of advertising data from Meta Platforms; (3) the Company was also participating in manipulative practices to force unwanted apps on customers through a "backdoor installation scheme; (4) this "backdoor installation scheme" artificially inflated the Company's installation numbers on its applications; and (5) as a result of the foregoing, the Company's profits were artificially inflated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

121.    Two weeks after these final disclosures, on February 26, 2025, the truth emerged when Culper Research and Fuzzy Panda Research published reports that alleged that the AXON 2.0 platform is merely a front and has not actually been the cause of the Company's recent financial growth. Instead, the reports claim that the Company's growth has been the result of the Application Misconduct.

122.    The Culper Research report claimed that, between 2022 until at least late 2024, the Company had discovered a code that allowed it to download applications directly onto people's phones without their knowledge or approval. The report specifically alleges that "[t]he permission allows the apps to 'bind' to AppHub, effectively borrowing or inheriting AppHub's one-click direct install permissions as their own. This permission is presently embedded within many of the most popular free-to-play games in the world, including Subway Surfers, 8 Ball Pool, Wordscapes, and Angry Birds 2."

123.    In essence, the reports claimed that the Company utilizes manipulative practices, such as taking advantage of permissions within apps to make installations without users noticing, which would falsely inflate the Company's installation numbers and, as a result, profit figures. The reports also claimed that the Company was breaking down and taking advantage of data from Meta Platforms in order to give the illusion that the Company's e-commerce segment was performing better than it actually was.

124.    On this news, the price of the Company's stock fell $46.06 per share, or approximately 12.2%, from a close of $377.06 per share on February 25, 2025, to close at $331 per share on February 26, 2025.

## DAMAGES TO APPLOVIN

125.    As a direct and proximate result of the Individual Defendants' conduct, AppLovin has lost and will continue to lose and expend many millions of dollars.

126.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection

thereto.

127.  Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.  Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129.  Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

130.  As a direct and proximate result of the Individual Defendants' conduct, AppLovin has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

131.  Plaintiff brings this action derivatively and for the benefit of AppLovin to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of AppLovin, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Foroughi and Stumpf.

132.  AppLovin is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.  Plaintiff is, and has been at all relevant times, a shareholder of AppLovin. Plaintiff will adequately and fairly represent the interests of AppLovin in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

135.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, AppLovin's Board consisted of the following nine individuals: Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time this action was filed.

136.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly engage to in and/or cause the Company to engage in the Application Misconduct and to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

137.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted AppLovin to engage in the Application Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused AppLovin to issue false and misleading statements which were intended to make AppLovin appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary

duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138.   Additional reasons that demand on Defendant Foroughi is futile follow. Defendant Foroughi co-founded the Company in 2011 and has served as its CEO and a director since then. He has also served as the Chairman of the Company's Board since March 2021. In addition, Defendant Foroughi is the controlling shareholder of the Company. The Company provides Defendant Foroughi with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Defendant Foroughi also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, Vivas, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein, and personally made many of the false and misleading statements himself. Moreover, Defendant Foroughi's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. Moreover, Defendant Foroughi is named as a defendant in the Securities Class Action. For these reasons, Defendant Foroughi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant Billings is futile follow. Defendant Billings has served as a Company director since December 2020, and as the

Lead Independent Director since February 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Billings has received and continues to receive handsome compensation for his role as a director. Defendant Billings also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, Vivas, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Billings breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

140.    Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since August 2018. He also serves as an Advisor to the CEO of the Company, a role he has served since January 2024. Previously, Defendant Chen also served as CFO of the Company from November 2019 until December 2023. The Company provides Defendant Chen with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Defendant Chen also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, Vivas, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his

duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Chen's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate his motive to participate in the scheme. For these reasons too, Defendant Chen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

141.    Additional reasons that demand on Defendant Georgiadis is futile follow. Defendant Georgiadis has served as a Company director since January 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Georgiadis has received and continues to receive handsome compensation for her role as a director. Defendant Georgiadis also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Harvey Dawson, Messing, Morgenfeld, Oberwager, Vivas, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Georgiadis's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate her motive to participate in the scheme. For these reasons too, Defendant Georgiadis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

142.    Additional reasons that demand on Defendant Harvey Dawson is futile follow.

Defendant Harvey Dawson has served as a Company director since November 2021. She also serves as a member of the Audit Committee and a member of the Nominating and Corporate Governance Committee. Defendant Harvey Dawson has received and continues to receive handsome compensation for her role as a director. Defendant Harvey Dawson also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Georgiadis, Messing, Morgenfeld, Oberwager, Vivas, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Harvey Dawson's insider sale made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrate her motive to participate in the scheme. For these reasons too, Defendant Harvey Dawson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

143. Additional reasons that demand on Defendant Messing is futile follow. Defendant Messing has served as a Company director since March 2024. She also serves as a member of Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Messing has received and continues to receive handsome compensation for her role as a director. Defendant Messing also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Morgenfeld, Oberwager, Vivas, and herself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director,

she conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Messing breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

144.    Additional reasons that demand on Defendant Morgenfeld is futile follow. Defendant Morgenfeld has served as a Company director since September 2023. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Morgenfeld has received and continues to receive handsome compensation for his role as a director. Defendant Morgenfeld also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Oberwager, Vivas, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Morgenfeld breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

145.    Additional reasons that demand on Defendant Oberwager is futile follow. Defendant Oberwager has served as a Company director since November 2019. Defendant Oberwager has received and continues to receive handsome compensation for his role as a director. Defendant Oberwager also solicited the 2024 Proxy Statement, which contained

false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Vivas, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Oberwager breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

146.    Additional reasons that demand on Defendant Vivas is futile follow. Defendant Vivas has served as a Company director since August 2018. Defendant Vivas has received and continues to receive handsome compensation for his role as a director. Defendant Vivas also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Application Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Vivas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

147.    Additional reasons that demand on the Board is futile follow.

148.    Demand in this case is further excused because Defendant Chen is beholden to and controlled by Defendant Foroughi, a primary interested wrongdoer who is the

Company's controlling shareholder. As an employee of the Company, Defendant Chen's continued employment is controlled by Defendant Foroughi. In light of this control, Defendant Chen cannot consider a demand against Defendant Foroughi, an interested, primary wrongdoer, as he is dependent on him for his continued employment with the Company and the lucrative compensation that goes with that. Thus, Defendant Chen is unable to evaluate demand with disinterest or independence given Defendant Foroughi's control over him.

149.    Defendants Morgenfeld (as Chair), Billings, Georgiadis, and Harvey Dawson (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Application Misconduct and the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the Application Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

150.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Application Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment,

abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

151.    AppLovin has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for AppLovin any part of the damages AppLovin suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

152.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

153.    The acts complained of herein constitute violations of fiduciary duties owed by AppLovin's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

154.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their

protection with corporate funds, i.e., monies belonging to the stockholders of AppLovin. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AppLovin, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

155.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause AppLovin to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

156.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of**
**Section 14(a) of the Exchange Act**

157.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or

appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

160.    Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) neither the AXON 2.0 platform nor the Company's "cutting-edge AI technologies" were responsible for the Company's ability to better match advertisements to mobile games; (2) in fact, the Company was actually taking advantage of advertising data from Meta Platforms; (3) the Company was also participating in manipulative practices to force unwanted apps on customers through a "backdoor installation scheme; (4) this "backdoor installation scheme" artificially inflated the Company's installation numbers on its applications; and (5) as a result of the foregoing, the Company's profits were artificially inflated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

161.    Under the direction and watch of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk

oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

162.   In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

163.   As a result of Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Foroughi, Billings, Chen, Georgiadis, Harvey Dawson, Messing, Morgenfeld, Oberwager, and Vivas to the Board, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

164.   The Company was damaged as a result of Defendants Foroughi's, Billings's, Chen's, Georgiadis's, Harvey Dawson's, Messing's, Morgenfeld's, Oberwager's, and Vivas's material misrepresentations and omissions in the 2024 Proxy Statement.

165.   Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

166.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AppLovin's business and affairs.

168.   Each of the Individual Defendants violated and breached their fiduciary duties

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AppLovin.

170.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Application Misconduct.

171.    In breach of their fiduciary duties owed to AppLovin, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) neither the AXON 2.0 platform nor the Company's "cutting-edge AI technologies" were responsible for the Company's ability to better match advertisements to mobile games; (2) in fact, the Company was actually taking advantage of advertising data from Meta Platforms; (3) the Company was also participating in manipulative practices to force unwanted apps on customers through a "backdoor installation scheme; (4) this "backdoor installation scheme" artificially inflated the Company's installation numbers on its applications; and (5) as a result of the foregoing, the Company's profits were artificially inflated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

172.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

173.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

174.    In yet further breach of their fiduciary duties, during the Relevant Period,

while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $254.2 million.

175.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Application Misconduct and to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations or to prevent the Company from engaging in the Application Misconduct. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AppLovin's securities.

176.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AppLovin's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

177.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.   As a direct and proximate result of the Individual Defendants' breaches of

their fiduciary obligations, AppLovin has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.   Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AppLovin.

182.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from AppLovin that was tied to the performance or artificially inflated valuation of AppLovin, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

183.   Plaintiff, as a shareholder and a representative of AppLovin, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

184.   Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

185.   Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

186.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AppLovin, for which they are legally responsible.

187.    As a direct and proximate result of the Individual Defendants' abuse of control, AppLovin has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AppLovin in a manner consistent with the operations of a publicly held corporation.

191.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AppLovin has sustained and will continue to sustain significant damages.

192.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193.    Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the

Company.

196.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AppLovin to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198.    Plaintiff, on behalf of AppLovin, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Foroughi and Stumpf for Contribution Under Sections 10(b) and 21D of the Exchange Act

199.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200.    AppLovin and Defendants Foroughi and Stumpf are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Foroughi's and Defendant Stumpf's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

201.    Defendants Foroughi and Stumpf, because of their positions of control and authority as controlling shareholder, officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

202.    Accordingly, Defendants Foroughi and Stumpf are liable under 15 U.S.C.

§ 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203.  As such, AppLovin is entitled to receive all appropriate contribution or indemnification from Defendants Foroughi and Stumpf.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)  Declaring that Plaintiff may maintain this action on behalf of AppLovin, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AppLovin;

(c)  Determining and awarding to AppLovin the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing AppLovin and the Individual Defendants to take all necessary actions to reform and improve AppLovin's corporate governance and internal procedures to comply with applicable laws and to protect AppLovin and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of AppLovin to nominate at least five candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)  Awarding AppLovin restitution from Individual Defendants, and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)  Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 24, 2025                 Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Amit Patel, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20__ day of March, 2025.

DocuSigned by:

*Amit Patel*

44060272F5D641F...

Amit Patel